**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORTH WORTH DIVISION**

| | | |
|---|---|---|
| X. CORP. | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 4:26-cv-1254 |
| | § | |
| IMMORTAL SNAIL, LLC | § | |
| *Defendant.* | § | |
| | § | |

**PLAINTIFF X CORP.'S ORIGINAL COMPLAINT
AND APPLICATION TO STAY ARBITRATION**

Plaintiff X Corp. ("X") files this Original Complaint and Application to Stay Arbitration pursuant to Texas Civil Practice & Remedies Code Section 171.023, arising from Defendant Immortal Snail, LLC's ("Snail") demand for arbitration and statement of claim filed with the American Arbitration Association (AAA Case Number 01-26-0001-6924, the "arbitration"). X respectfully shows the Court as follows:

## I. INTRODUCTION

1. This case involves an arbitration filed by criminal threat actors to regain control of their suspended X accounts in order to continue promoting an online crypto casino. The parties never contracted to arbitrate the dispute. Instead, the parties' contracts uniformly mandate that the claims must be brought in Texas federal or state court.

2. Ossi Eemeli Ketola, who calls himself "monarch" on the internet, is the founder of two gambling websites that are not authorized to operate or do business in the United States,

CSGOEmpire and Duel. Since 2024, Ketola and his associates – including his companies such as Immortal Snail – have compromised X accounts; illicitly bribed X's employees to disclose account information, transfer usernames, and reinstate suspended X accounts without authorization; sent fraudulent demands to X impersonating law enforcement agencies and U.S. law firms, demanding that X reinstate their suspended accounts and take down the X accounts of their competitors; conspired to circumvent X's content moderation measures, enforcement actions, security controls, and Terms of Service; and engaged in fraudulent and criminal acts on the X platform.

3. CSGOEmpire is a gambling site popular with teens and young adults.[1] CSGOEmpire is operated by Moonrail Limited B.V., a Curaçao company, and is not authorized to do business in the U.S. and various other countries. Spain has fined Moonrail Limited €5 million for operating without a gambling license while illegally targeting Spanish residents. Sweden has banned Moonrail Limited from targeting Swedish residents, and Danish authorities have obtained court orders blocking CSGOEmpire.[2]

4. Duel.com is a crypto gambling site operated by Immortal Snail LLC, an offshore company registered in Nevis that is not authorized to do business in the U.S.[3]

---

[1] Nick Devor, '*It Ruined a Lot of Years of My Life.' Teens and Young Adults Are Hooked on a Different Kind of Gambling*, Barron's (Dec. 9, 2024), http://archive.today/TyzKi; *Attorney General Sues Game Developer for Promoting Illegal Gambling Through Video Games*, N.Y. Attorney General (Feb. 25, 2026), https://ag.ny.gov/press-release/2026/attorney-general-james-sues-game-developer-promoting-illegal-gambling-through. Valve Corporation publishes the Counter-Strike series of shooter games. In 2013, it added purchasable and tradable cosmetic weapon finishes, called "skins," to Counter-Strike: Global Offensive ("CS:GO"). In 2023, it released Counter-Strike 2 ("CS2"), which replaced CS:GO. On the CSGOEmpire gambling site, a skin is the functional equivalent of a casino chip.

[2] *Cults, vendettas, gambling: how a ten-year long feud led to a stage invasion at the CS2 major*, Internet Talk (June 9, 2024), http://archive.today/qoFZY.

[3] Neil Bedi et al., *Inside the Dark and Predatory World of Crypto Casinos*, New York Times (Dec. 9, 2025), https://www.nytimes.com/interactive/2025/12/09/us/crypto-casinos-gambling-streamers.html (archived at http://archive.today/nYNYr); National Association of Attorneys General, *Letter to U.S. Department of Justice* (Aug. 5, 2025), https://www.naag.org/wp-content/uploads/2025/08/Multistate_Illegal-Offshore-Gambling_FINAL-corrected-003.pdf.

5. In 2024, Ketola and Snail conspired to take over X accounts with the usernames @duel and @monarch in order to promote their crypto casino. They first compromised and took over another user's X account that had the username @duel. Within days, X suspended the accounts for being compromised and stolen. Ketola and Snail then bribed X's employees to transfer control of those accounts to Ketola and Snail, and to reinstate accounts that X had suspended for platform manipulation, spam, and fraudulent activity. Ketola and Snail were also involved in hacking X accounts, including an account of CSGOEmpire's former product manager who had a falling out with Ketola and who had posted evidence about Ketola and his organization's criminal activities – for instance, that they had hacked Israeli government email addresses and sent demands to online platforms from those email addresses to take down the accounts of CSGOEmpire's competitors.

6. In late 2024, X suspended the @duel and @monarch accounts that Ketola and Snail had compromised and taken over. Ketola and Snail then engaged a third party named Haci Isik to attempt to regain control of those account handles. In January 2025, Isik tried to find an X employee who he could bribe to reinstate the suspended accounts. After that failed, Isik sought to obtain the handles by purchasing them from X. He contacted X and fraudulently represented that he wanted to purchase the handles for his new gaming company. In March, April, and June 2025, Isik facilitated the purchases of @duel, @monarch, and @castle from X.[4] Although Isik was the one who communicated with X, Snail made the payments to purchase the handles. In doing so, Snail and Isik fraudulently omitted that Snail had operated the prior @duel and @monarch handles that had been stolen and were suspended.

[4] X allows eligible users to purchase certain inactive handles. While X retains ownership of all handles, the sale of a handle provides a user with a limited, revocable, and non-transferable license to use the handle, subject to various policies and terms.

7. On information and belief, in April 2025, Ketola and Snail were also involved in submitting a fraudulent trademark infringement report to X attaching doctored documents so that X would suspend the account of CSGOEmpire's former Social Media Manager, who had posted screenshots and documents about Ketola and his organizations' illicit activities.[5]

8. On June 30, 2025, X suspended Isik's X account for offering to pay third parties for prohibited services such as paid suspensions, reinstatements, username swaps, and other platform manipulation activity. Subsequently, X discovered that Ketola and Snail were responsible for bribing multiple X employees, compromising numerous X accounts, and stealing the prior @duel and @monarch accounts. Not only are these severe violations of X's Terms of Service, they are violations of civil and criminal laws in the United States.

9. Around October 21, 2025, X suspended Ketola and Snail's accounts @duel, @monarch, and @castle for severe violations of the platform's terms, including ban evasion. Following these suspensions, Ketola and Snail sent fraudulent letters to X impersonating a U.S. law firm and demanding the reinstatement of the accounts. Exs. 1-2 (Appx. 004-007). They also attempted to bribe X's employees to reinstate the accounts, including offering one X employee $300,000 through various messaging platforms.

10. Ketola and Snail argue that their accounts were suspended because the accounts were reported by Snail's competitors, or because X's employees were bribed to suspend the accounts. As detailed in this complaint, Ketola and Snail are the ones who have systematically engaged in commercial bribery, and X has suspended their accounts for serious security breaches and to protect the integrity of its platform. *See* Ex. 7 (Appx. 022-026).

11. On April 8, 2026, Snail filed the arbitration, alleging that the suspensions of @duel,

---

[5] @kraken_momd, https://x.com/kraken_momd; *see also* @ScamMalta, https://x.com/ScamMalta.

@monarch, and @castle amount to breach of contract and seeking an order requiring X to "fully restore Claimant's platform access including full control, use, and functionality for @Duel, @Monarch, and @Castle." Even after initiating the arbitration, Snail's misconduct has continued: On information and belief, in May 2026, Ketola and Snail submitted a fraudulent legal request to X impersonating the Royal Malaysian Police and demanding that X reinstate their related account @CS2skincom. Ex. 4 (Appx. 010-011). As detailed below, they also submitted fraudulent complaints to a governmental tribunal in India seeking to reinstate @CS2skincom. Exs. 5-6 (Appx. 012-021).

12. The parties never contracted to arbitrate this dispute, and no contract entered by the parties contains an arbitration agreement. Instead, the parties' contracts uniformly mandate that Snail bring its claims in Texas federal or state court. ***First***, to create an account or use the X platform, Snail agreed to X's Terms of Service, which provide—and have always provided—that any disputes related to X's Terms of Service or the X service must be brought in court. Ex. 8 (Appx. 027-047) (operative version effective Nov. 15, 2024); Ex. 9 (Appx. 048-069) (current version effective Jan. 15, 2026).[6] ***Second***, to purchase the handles, Snail was required to have an X Premium subscription and agree to X's Purchaser Terms, which independently provide that all disputes must be brought in court. Ex. 10 (Appx. 070-090). ***Third***, by submitting each payment to purchase the handles in March, April, and June 2025, Snail agreed to X's Handle Transfer Agreement that was in effect during that time; that agreement requires that all disputes be resolved "in the federal or state courts located in Tarrant County, Texas" and does not state anywhere that it may be amended, modified, or superseded. Exs. 12-13 (Appx. 126-138).

---

[6] *See* https://x.com/en/tos/previous (all previous versions of X's Terms of Service).

13. To try to circumvent this reality, Snail relies on a document called the "X Handle Marketplace Terms" that does not apply to the handle sales from X to Snail in March, April, and June 2025. Months after the transactions at issue occurred, on October 18, 2025, X announced that it would launch a new website called the "X Handle Marketplace" at handles.x.com, through which users can request and purchase inactive handles, and invited users to apply to join the waitlist to participate in the new program. Exs. 14-18 (Appx. 139-168). Over the next five weeks, X allowed only a limited number of approved users to participate in the new program. Ex. 15 (Appx. 147-154). On November 21, 2025, all X Premium users were given access to the X Handle Marketplace. *Id.* at 7. Along with that launch, X published requirements for participating in the X Handle Marketplace Program. Ex. 14 (Appx. 139-146). X also published the "X Handle Marketplace Terms" dated October 13, 2025 with terms and conditions for the Handle Marketplace Program. Ex. 19 (Appx. 169-187). That document applies only to transactions occurring *after* October 13, 2025. Snail did not purchase @duel, @monarch, or @castle through the X Handle Marketplace, and its purchases could not have been subject to the X Handle Marketplace Terms, because the X Handle Marketplace did not exist in March, April, or June 2025. Nor would Snail have been eligible to participate in the X Handle Marketplace Program due to its severe violations of the Terms of Service and the fact that its accounts were suspended on October 21, 2025.

14. Even the "X Handle Marketplace Terms," which is not the parties' contract, establishes that no arbitration agreement exists. The arbitration clause in it applies "**ONLY IF YOU LIVE IN THE UNITED STATES**." Ex. 19 (Appx. 169-187), § 12 (emphasis original). Snail admits that it is not located in the United States and is incorporated abroad.

15. On June 5, 2026 and June 26, 2026, X objected to the jurisdiction of the American Arbitration Association ("AAA"). Exs. 20, 22 (Appx. 188-205, 209-210). Over X's objections that

the parties never agreed to arbitrate the dispute, the AAA appointed an arbitrator and authorized him to determine the extent of his own jurisdiction. Exs. 21, 23 (Appx. 206-208, 211-213). On August 25, 2026, the arbitrator issued an order stating that he intends to determine the arbitrability of the dispute and then address the merits of Snail's claim for injunctive relief. Ex. 24 (Appx. 214-218). This is improper. Under binding U.S. Supreme Court precedent, whether the parties have agreed to arbitrate a dispute is a quintessential question for the court, not an arbitrator, unless the parties "clearly and unmistakably provide otherwise." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986); *see also Coinbase, Inc. v. Suski*, 602 U.S. 143, 152 (2024). Here, the parties never agreed to arbitrate at all, much less to delegate threshold questions of arbitrability to an arbitrator.

16. X therefore seeks urgent relief under governing Texas law, which provides that "[a] court may stay an arbitration commenced or threatened on application and a showing that there is not an agreement to arbitrate." Tex. Civ. Prac. & Rem. Code § 171.023(a). To protect X's rights while the Court resolves X's claims for declaratory relief and a permanent stay of the arbitration, X further seeks a temporary restraining order and preliminary injunction.

## II. PARTIES

17. Plaintiff X Corp. is a Nevada corporation with its principal place of business in Austin, Texas. X owns and operates the online platform X, accessible through X.com and various mobile and online applications.

18. Defendant Immortal Snail, LLC is a St. Kitts & Nevis limited liability company. On information and belief, its principal place of business is in Charlestown, Nevis. Snail operates Duel.com, an online crypto casino that is not authorized to do business in the U.S.

## III. JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because complete diversity exists, and the amount in controversy exceeds $75,000. *See* Ex. 25 (Appx. 219-255). Immortal Snail seeks damages exceeding $75,000 in the underlying arbitration, and X seeks damages exceeding $75,000 in this action.

20. Snail consented to this Court's personal jurisdiction in at least three contracts with X. Through its use of multiple accounts on X, Snail expressly consented to X's Terms of Service, which require all disputes related to the X platform to "be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas." Ex. 8 (Appx. 027-047), § 6 and Ex. 9 (Appx. 048-069). In that same agreement, Snail consented to personal jurisdiction in Texas. *Id.* Additionally, when it purchased an X Premium subscription, Snail agreed to X's Purchaser Terms of Service ("Purchaser Terms"). The Purchaser Terms similarly mandate that "[a]ll disputes related to these Terms, including any disputes, claims, or controversies arising out of or relating to these Terms, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas," and that Snail "consent[s] to personal jurisdiction" in Texas. Ex. 10 (Appx. 070-090). Moreover, Snail agreed to X's Handle Transfer Agreement that governed the purchases of three handles in March, April, and June of 2025. Exs. 12-13 (Appx. 126-138). The Handle Transfer Agreement provides that "[a]ll disputes related to this Agreement will be brought solely in the federal or state courts located in Tarrant County, Texas, United States," and that Snail "consent[s] to personal jurisdiction" in Texas. Ex. 12 (Ex. 126-131).

21. Venue is proper in this Court under 28 U.S.C. § 1391(c)(3) because Snail is not a resident of the United States and may therefore be sued in any judicial district. Additionally, venue

is proper in this Court under 28 U.S.C. § 1391(b)(3) because Snail is subject to personal jurisdiction in the Northern District of Texas. Venue is also proper in this Court because, by agreeing to X's Terms of Service, Purchaser Terms, and Handle Transfer Agreement, Snail consented to litigate in this forum and has waived any objection as to inconvenient forum. Exs. Ex. 8, 10, 12 (Appx. 027-047, 070-090, 126-131).

## IV. FACTUAL BACKGROUND

### A. X's Platform and Terms of Service

22. X Corp. operates the service "X," available at x.com, which allows its registered users to create and share ideas and information instantly through various product features, including public posts. To engage with X's platform, a user must create an account that is associated with a specific handle (i.e., "@[handle name]"). An "account handle," which is the same thing as a "screen name" or "username," begins with the "@" symbol. Each handle is unique, and accounts may not share handles or duplicate other handles that are already in use.

23. Some accounts, and their associated handles, may become inactive if the user who originally registered the handle ceases to use their account and handle on X's platform. X retains the right to transfer or reassign unused or inactive handles to other users.

24. To create an account or use X, users must agree to X's Terms of Service, available at x.com/tos. Among other prohibitions, X's Terms of Service provide that:

a. Users may not "engage in any conduct that violates [X's] Platform Manipulation and Spam Policy or any other Rules and Policies" (Terms of Service, § 4);

b. Users may not "facilitate or assist others in violating [X's] Terms" (*id.*);

c. Users may not "probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures" (*id.*);

d. Users may not assign, sell, share, or transfer their limited licenses to their accounts, including their account handles, which remain X's "exclusive property" (*id.*);

e. Users may not "inauthentic[ally] use [] X engagement features to artificially impact traffic or disrupt people's experience," including by "[t]rading, buying, selling (either through monetary or virtual compensation) or soliciting access of X accounts," "using or promoting third-party services to perform any of the transactions described in this policy," or misusing X's reporting features or forms "to harass others under false pretenses or hope to cause their account(s) or post(s) to be restricted or removed" (X Authenticity Policy); and

f. Users "may not circumvent X enforcement actions," and "[i]f an account has been suspended for violations of the X Rules, X reserves the right to also suspend any other account we believe the same account holder or entity may be operating in violation of our earlier suspension, regardless of when the other account was created" (*id.*).

25. The Terms of Service provide—and have always provided—that any disputes related to X's Terms of Service or the X service must be resolved in court. Ex. 9 (Appx. 048-069).[7]

**B. Immortal Snail's Violations of X's Terms of Service and Illegal Conduct**

26. Snail operates Duel, a crypto gambling website that is not authorized to do business in the U.S.[8] Duel's founder, Ossi Ketola, also owns CSGOEmpire, a gambling website operated by Moonrail Limited B.V. that is also not authorized to do business in the U.S. Since its launch, Duel has attracted media attention for controversies including promoting gambling to minors[9]; sponsoring a Polymarket "challenge" in which an influencer attempted to fast for 40 days in the

---

[7] *See* https://x.com/en/tos/previous (all previous versions of X's Terms of Service).

[8] *See* Duel Terms of Service, https://duel.com/policies/tos ("Due to specific laws and regulations, we are not allowed to accept players from … the United States of America ...").

[9] Neil Bedi et al., *Inside the Dark and Predatory World of Crypto Casinos*, New York Times (Dec. 9, 2025), https://www.nytimes.com/interactive/2025/12/09/us/crypto-casinos-gambling-streamers.html (archived at http://archive.today/nYNYr).

Saudi Arabian desert, while encouraging betting on whether he would die[10]; repeatedly allowing a blackjack dealer to wear Nazi attire while streaming games[11]; imitating the San Diego mosque shooter on its live streams[12]; and offering to post bond for Dalton Eatherly, aka "Chud the Builder," who was arrested for the attempted murder of a disabled Army veteran outside a courthouse in Tennessee.[13]

27. Ketola and Snail have repeatedly violated X's Terms of Service and the X Rules, including its Authenticity Policy, Platform Manipulation and Spam Policy, Misleading and Deceptive Identities Policy, Financial Scam Policy, and Ban Evasion Policy.

28. On April 2, 2024, reports emerged that Ketola and CSGOEmpire were involved in hacking the X account of CSGOEmpire's competitor, @CSGORoll.[14] On a public livestream during the account hack, Ketola celebrated the hack, stated that "the Immortal Snail will get you," attributed the hack to an individual named "Sticky Hand," said that Sticky Hand "works for me," and congratulated him on air. The X account of Sticky Hand promotes Duel.com and is linked to multiple CSGOEmpire accounts.

29. On April 3, 2024, X suspended Ketola and Snail's related account @JNSAST, after reports of targeted harassment, doxxing, and violent threats. Ketola curated the content on @JNSAST to make it look like it was operated by a "hit squad" that goes after Ketola's enemies,

---

[10] Ossi Ketola's X post from @monarch (Sep. 18, 2025) ("@Polymarket what's gonna happen to the bet I placed on him completing the 40 day fast?"); Connor Sephton, *Lord Miles Isn't Dead: Polymarket Scandal Takes New Turn*, Yahoo! Finance (Sept. 29, 2025), https://finance.yahoo.com/news/lord-miles-isn-t-dead-195233028.html; *Lord Miles: Polymarket Chaos Erupts Over Claims YouTuber Died During 40-Day Fast*, CryptoNews (Sep. 20, 2025), https://cryptonews.com/exclusives/lord-miles-polymarket-chaos-over-claim-youtuber-died-during-40-day-fast.

[11] Uladzislaŭ Kalita, *Duel.com Crosses Every Red Line: Blackjack Streams Descended into Nazi Salutes and Trash Theatre,* Tribuna (May 21, 2026), https://tribuna.com/en/casino/blogs/duelcom-crossed-every-red-line-blackjack-streams-descended-i/.

[12] https://x.com/IntCyberDigest/status/2057741297356509403.

[13] Sumit Roy, *ChudTheBuilder May Be Released After Reported $1M Bond Offer form Crypto Casino "Duel,"* Times of India (May 23, 2026), https://timesofindia.indiatimes.com/world/us-streamers/chudthebuilder-may-be-released-after-reported-1m-bond-offer-from-crypto-casino-duel/articleshow/131268163.cms.

[14] *See* https://archive.ph/qoFZY; *CSGOEmpire affiliated accounts threaten further disruptions*, Dust2 (Mar. 29, 2024), https://www.dust2.us/news/46780/csgoempire-affiliated-accounts-threaten-further-disruptions.

posting militant-style videos and messages. Its Bio stated: "The JNSAST is a special law enforcement division of The Castle, which is responsible for the apprehension of sinners." After X suspended @JNSAST, Ketola and Snail circumvented the suspension by using a different account @theJNSAST to continue posting the same content. As detailed below, on July 30, 2024, Ketola and Snail also bribed an X contractor to reinstate @JNSAST without authorization.

30. In February 2025, Ketola and Snail hacked the X account of "Grizzly," CSGOEmpire's former Product Manager who had a falling out with Ketola and who had posted evidence of Ketola and CSGOEmpire's criminal activities. That evidence included internal Discord and Telegram conversations about Ketola's involvement in hacking Israeli government email addresses and sending demands to online platforms from those addresses to take down the accounts of CSGOEmpire's competitors, including CSGORoll, and discussions about the language to use "so it looks like it came from a legit government."[15]

31. Grizzly also posted that he has "over 6.5 GB of chat exports and evidence against Monarch [Ketola] including plans to dox family members in the community, physical attacks against Stake [a competitor gambling website]," and stated that he was "putting [his] life at risk by posting" the information and was "[l]ooking for a journalist to hand over all my files to ASAP."[16]

32. One video posted by Grizzly shows a Discord conversation between "Gr1zzly" and "Monarch" (i.e., Ketola), in which Monarch states: "you have no idea how busy it's been. we've been dealing with literal bosnian mafia. planning kidnapping and potential murders. getting doxes

---

[15] "Neutral observer" (@fastschitzobear), https://x.com/fastschitzobear/status/1885679944828645611. This account is linked to Ketola and Snail's @CSGOEmpire, @CSGOEmpireV2, @duel and @monarch accounts. All of these accounts used the same Known Device Token ("KDT"). Using the same KDT means the accounts logged in previously using the same mobile device or web browser device. This suggests that the person operating @fastschitzobear worked with Ketola and Snail. Prior to the whistleblower posts, @fastschitzobear had also posted content that was consistent with the types of disparaging content that Ketola and Snail posted on X.

[16] "Neutral observer" (@fastschitzobear), https://x.com/fastschitzobear/thread/1885677396088467764.

on all the twitter people. I want to get in the loop by meeting and calling with the executives"; "Had to literally cut someone's hand off for stealing from me ... that's been my last month"; "Got scammed 2 times with torture/hit services locally and when we finally found a group it created a shitshow getting some hands chopped."[17]

33. Another video posted by Grizzly shows a Telegram conversation in which "Ossi," presumably Ossi Ketola, discusses hacking government emails and states: "The emails are the most sophisticated tool for our mission. With the emails we can basically operate like gods and complete our cult missions. Anyone we want taken down, we can. This is real cultdawg shit finally... we need to go further and more serious, similar to Scientology. ... We need to take over the world literally, become a real cult. We need to be on Ylilauta and CNN whatever it takes. We need to create shrines and draw blood."; "I am very tempted to start getting into more serious business, we have the money and connections. We have the contacts. Felix is already deep in the intelligence community. It's time to make the cult serious and start eliminating people."[18]

34. After hacking into one of Grizzly's X accounts, Ketola and Snail changed the account's Bio from "Ex-CSGOEmpire" to "This account has been seized by @theJNSAST." They then used that account to promote the online crypto casino, Duel. In addition, on February 3, 2025, an X account associated with Ketola and Snail, @monarchlawyer, posted on X: "I am proud to announce that, in collaboration with @theJNSAST, we have successfully seized the X (formerly Twitter) account 'Neutral observer', @observingbear, identified as an alternate account of Gr1zzly." Prior to this, in January 2025, Snail operative Haci Isik also requested that X suspend accounts related to "Gr1zzly."

[17] "Neutral observer" (@fastschitzobear), https://x.com/fastschitzobear/status/1885293386879422613; https://x.com/fastschitzobear/status/1885680240787128622.

[18] "Neutral observer" (@fastschitzobear), https://x.com/fastschitzobear/status/1885680240787128622.

35. On information and belief, on April 18, 2025, Ketola and Snail were involved in submitting a fraudulent trademark infringement report to X attaching doctored documents so that X would suspend the account of CSGOEmpire's former social media manager, who had posted screenshots and documents about Ketola and his organizations' illicit activities.[19]

**1. Hacking and theft of @duel handle**

36. On March 25, 2024, Ketola and Snail compromised and took over another user's X account that had the username @duel. After taking over the account, they changed its email address to cryptoinvoices@moonrail.limited (linked to Ketola's company CSGOEmpire), destroyed the linked phone number, and changed the Bio to say "next generation crypto casino." They then used the @duel account to post about the launch of their crypto casino and, in their posts, tagged other X accounts associated with CSGOEmpire and Ossi Ketola.

37. On March 26, 2024, Ketola posted from his X account (@CSGOEmpireV2) and tagged the stolen @duel account, stating, "@duel Let's make gambling great again."

38. On March 27, 2024, X suspended the @duel account for being compromised and stolen. Ketola and Snail then made systematic attempts to breach X's platform security to regain control of the @duel handle in order to continue promoting their online crypto casino. In doing so, Ketola and Snail took active steps to conceal their conduct, including by hiring middlemen and third parties to bribe X's employees or submit requests to X on their behalf.

39. On June 26, 2024, acting through a middleman, Ketola and Snail bribed an X employee to provide internal information about the @duel account without authorization. The employee was terminated.

---

[19] @kraken_momd, https://x.com/kraken_momd; *see also* @ScamMalta, https://x.com/ScamMalta.

40. On October 23, 2024, again through a middleman, Ketola and Snail bribed an X contractor to reinstate @duel without authorization. The contractor was terminated and, on October 25, 2024, X re-suspended the @duel account.

41. In December 2024, Ketola and Snail engaged Haci Isik to help them regain control of the @duel account. In December 2024 and January 2025, Isik contacted third parties to ask if they have an X insider who could reinstate the suspended @duel account. He also asked if they knew anyone at X who "would take decent money for stuff like this" and would "ban users as a service." After failing to find anyone at X to bribe, Isik sought to obtain the handle by purchasing it directly from X.

42. In February 2025, Isik messaged an X employee and fraudulently represented that, "In a couple months I'm planning on launching an Esports/FPS website with some CS veterans where users can duel each other 1v1 or 2v2 for a competitive ladder pool, for most FPS games" and requested to purchase @duel for that purpose.

43. After agreeing to the price, Isik stated that he had a placeholder X account called @duel_temp that the @duel handle could be transferred to. To purchase a handle, a user needs to have an active X Premium subscription. Although Isik was the one who communicated with X, the X Premium payment for @duel_temp was made by Moonrail Limited B.V., the operator of the CSGOEmpire gambling website. In addition, the transfer of the payment to purchase @duel was made by Immortal Snail on March 24, 2025. In purchasing the @duel handle, Snail and Isik fraudulently omitted that Immortal Snail had operated the prior @duel account that was stolen and had been suspended.

**2. Hacking and theft of @monarch handle**

44. On June 26, 2024, Ketola and Snail compromised the @monarch account on X. They bribed an X contractor to change that account's handle from @monarch to @monarchees, and then change the handle of an account under Ketola and Snail's control, @voula_s13, to @monarch ("**stolen @monarch account**").

45. That same day, X suspended the stolen @monarch account.

46. Two days later, on June 28, 2024, CSGOEmpire's Marketing Manager, Dusan Pecic, submitted an appeal of X's suspension of the stolen @monarch account. Ex. 3 (Appx. 008-009). In the appeal, Pecic input the non-public email address of the stolen @monarch account. To verify his identity, Pecic attached his Serbian ID card and an authorization letter from Moonrail Limited B.V., the operator of the CSGOEmpire gambling site.

47. On July 13, 2025, X denied Pecic's request to reinstate the stolen @monarch account and informed him: "We've reviewed your appeal, and determined your account will remain suspended for violating our misleading and deceptive identities policy."

48. On July 25, 2024, Ketola and Snail bribed an X employee to access without authorization the stolen @monarch account. The following day, the employee confessed to X that he had taken photos of internal information on his work screen and sent them to an external party who had offered him $1,500 to look into "monarch." The employee was terminated.

49. On July 30, 2024, Ketola and Snail bribed an X contractor to reinstate both the stolen @monarch account, as well as @JNSAST (the militant-style account), without authorization. X subsequently terminated the contractor and re-suspended the stolen @monarch account and @JNSAST.

50. The stolen @monarch account and @JNSAST are connected to Ossi Ketola, Snail, and CSGOEmpire via the use of overlapping devices, software clients, universally unique identifiers, device tokens, cookies, and financial accounts.

51. In April 2025, after Haci Isik purchased @duel from X, Isik contacted X again and sought to purchase the @monarch and @castle handles, which he represented "would be affiliates of the @Duel account." Although Isik was the one who communicated with X, Snail made the payments to purchase the handles. In doing so, Snail and Isik fraudulently omitted that Snail had operated the prior @monarch account that had been stolen and was suspended. On April 18, 2025, Ketola changed his account handle from @CSGOEmpireV2 to @monarch.

52. Snail and Isik's illicit conduct continued after these transfers. On June 5, 2025, for example, Isik offered payments to a third party to find X insiders who would suspend accounts critical of Ketola and his companies.

**C. X's Suspension of Snail's Accounts and the Resulting Arbitration**

53. On June 30, 2025, X suspended Isik's X account for offering to pay third parties for illicit services such as paid suspensions, reinstatements, username swaps, and other platform manipulation activity on X.

54. Subsequently, X discovered that Ketola and Snail were responsible for bribing multiple X employees, compromising numerous X accounts, and stealing the prior @duel and @monarch accounts. Not only are these severe violations of X's Terms of Service, they are violations of civil and criminal laws in the United States.

55. Around October 21, 2025, X suspended Ketola and Snail's accounts @duel, @monarch, and @castle for severe violations of the platform's terms, including ban evasion. X also suspended Ketola's related accounts @CSGOEmpire and @CS2skincom.

56. Following these suspensions, Ketola and Snail sent fraudulent letters to X impersonating a U.S. law firm and demanding the reinstatement of @duel and @monarch. Exs. 1-2 (Appx. 004-007). They also attempted to bribe X's employees to reinstate the accounts, including offering one X employee $300,000 through various messaging platforms.

57. After those and other efforts to be reinstated failed, Snail filed an arbitration with the AAA. In the arbitration, Snail seeks "a determination that X is required to immediately and fully restore Claimant's platform access including full control, use, and functionality for @Duel, @Monarch, and @Castle." Ex. 25 (Appx. 219-255), at 9 (Appx. 227).

58. Even after initiating the arbitration, Snail's misconduct has continued: On information and belief, on May 12, 2026, Ketola and Snail submitted a fraudulent legal request to X impersonating the Royal Malaysian Police and demanding that X reinstate their related account @CS2skincom. Ex. 4 (Appx. 010-011). After that failed, in July and August 2026, they submitted two fraudulent complaints to a governmental tribunal in India seeking to reinstate @CS2skincom. Exs. 5-6 (Appx. 012-021). These fraudulent complaints say they are filed by Indian residents, but identify the account's email as dr.a@cs2skin.com. That email is similar to the email listed on the purchase of the @duel, @monarch, and @castle handles, which is dr.a@duel.com. It is associated with Ketola and Snail's co-conspirator named Arya Azad.

59. These examples demonstrate Ketola and Snail's pattern of fraudulent conduct and forum shopping to circumvent X's enforcement measures in order to continue promoting online gambling websites.

## V. LEGAL BACKGROUND

### A. All of The Parties' Contracts Require Suit in Texas Court.

60. X Corp. never contracted to arbitrate this dispute or to have an arbitrator decide the question of arbitrability.

#### 1. X's Terms of Service require this dispute to be brought in Texas court.

61. To purchase the handles, Snail was required to have an X account. To create an account or use the X platform, users must agree to X's Terms of Service, available at x.com/tos. The Terms of Service provide—and have always provided—that any disputes must be brought in court.[20]

62. Snail had multiple accounts on X and thereby expressly consented to X's Terms of Service. *See* Ex. 8 (Appx. 027-047) (effective Nov. 15, 2024) § 1 (explaining that "using the Services … constitutes acceptance of these Terms"); Ex. 9 (Appx. 048-069) (effective Jan. 15, 2026) § 1 (same). In addition to enumerating rules governing the use of and content posted to X's platform, the Terms of Service—both the version in effect at the relevant time in 2025, and the version in effect today—provide for suit in Texas.

63. The version in effect at the relevant time in 2025 provides that:

> The laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us, notwithstanding any other agreement between you and us to the contrary. ***All disputes related to these Terms or the Services***, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, ***will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas***, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum.

Ex. 8 (027-047) (effective Nov. 15, 2024) § 6 (emphasis added).

---

[20] *See* https://x.com/en/tos/previous (all previous versions of X's Terms of Service).

64. The version in effect today, which was in effect from January 2026, three months before Snail filed the arbitration, similarly provides that "all disputes related to these Terms, the Services, or any patents — including without limitation disputes related to or arising from any Content (whether your or others' Content), or your or others' use of the Services or the complete or partial termination thereof — shall be brought and must proceed exclusively in the federal or state courts located in Wichita County or Tarrant County, Texas." Ex. 9 (Appx. 048-069) § 6.

65. Therefore, Snail agreed to bring its claims in Texas court.

**2. X's Purchaser Terms require this dispute to be brought in Texas court.**

66. To purchase the handles, Snail was also required to have an active X Premium subscription and agree to X's Purchaser Terms, which incorporate by reference X's Terms of Service and independently provide that all disputes must be brought in court. Like the Terms of Service, the Purchaser Terms in effect at the relevant times, between March and June 2025, provide:

> The laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us, notwithstanding any other agreement between you and us to the contrary. ***All disputes related to these Terms, including any disputes, claims, or controversies arising out of or relating to these Terms, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas***, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum.

Ex. 10 (Appx. 070-090) § 6 (emphasis added).

67. The current version of X's Purchaser Terms, effective August 1, 2025, contains the same forum selection provision. Ex. 11 (Appx. 091-125). Therefore, Snail agreed to bring its claims in Texas court.

**3. The Handle Transfer Agreement requires this dispute to be brought in Texas court.**

68. By submitting each payment to purchase access to the handles at issue in March,

April, and June 2025, Snail agreed to X's Handle Transfer Agreement that was in effect during that time period. The Handle Transfer Agreement entered by the parties that governs the handle sales is attached as Exhibit 12. *See* Ex. 12 (Appx. 126-131) ("This Handle Transfer Agreement … is effective as of the date of a completed payment …. ***By submitting a payment, you agree to and accept these terms***.") (emphasis added). The Handle Transfer Agreement was published and available on X's website during the entire period it was in effect. A printout of the Wayback Machine showing the Handle Transfer Agreement on X's website as late as September 2025 is attached as Exhibit 13.[21] The invoices that Snail received before paying for the handles in March, April, and June 2025 hyperlinked and incorporated by reference the Handle Transfer Agreement that was published and available on X's website. The Handle Transfer Agreement provides that:

> The laws of the State of Texas, excluding its choice of law provisions, will govern this Agreement and any dispute that arises between you and X. ***All disputes related to this Agreement will be brought solely in the federal or state courts located in Tarrant County, Texas***, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum. . . . These Terms constitute the entire agreement between you and X with respect to the Handle transfer only, and do not supersede the Rules, and any other agreements you may have with X.

Ex. 12 (Appx. 126-131) (emphasis added); Ex. 13 (Appx. 132-138) at 4 (Appx. 135) (printout of the Wayback Machine showing the Handle Transfer Agreement published on X's website as late as September 15, 2025).

69. The Handle Transfer Agreement does not contain any language stating that it may be amended, modified, or superseded. *See* Ex. 12 (Appx. 126-131).

70. Therefore, the parties never agreed to arbitrate this dispute. All of the parties' contracts—X's Terms of Service, the Purchaser Terms, and the Handle Transfer Agreement

---

[21] *See also* https://web.archive.org/web/20250421073434/https://legal.x.com/en/x-handle-transfer-agreement.html.

governing the handle sales—require that disputes between the parties be brought solely in federal or state courts located in this District.

**4. The document that Snail relies upon is not the parties' contract and, in any event, also establishes that no arbitration agreement exists.**

71. In an effort to circumvent this reality, Snail relies on a document called the "X Handle Marketplace Terms" that does not apply to the handle sales from X to Snail in March, April, and June 2025. Months after the transactions at issue occurred, on October 18, 2025, X announced that it would launch a new website called the "X Handle Marketplace" at handles.x.com and invited users to apply to join the waitlist to participate in the new program. Exs. 14-18 (Appx. 139-168). Over the next five weeks, X allowed only a limited number of approved users to participate in the new program. Ex. 15 (Appx. 147-154). On November 21, 2025, all X Premium users were given access to the Handle Marketplace. *Id.* at 7 (Appx. 153).[22]

72. Along with that launch, X published requirements for participating in the X Handle Marketplace Program. Ex. 14 (Appx. 139-146). X also published the "X Handle Marketplace Terms" dated October 13, 2025 with terms and conditions for the Handle Marketplace Program. Ex. 19 (Appx. 169-187) ("Handle Marketplace Terms"). That document applies only to transactions occurring *after* October 13, 2025. *See* Ex. 19 (Appx. 169-187) §§ 1, 6. Snail did not purchase @duel, @monarch, or @castle through the X Handle Marketplace, and its purchases could not have been subject to the X Handle Marketplace Terms, because the X Handle Marketplace did not exist in March, April, or June 2025. Nor would Snail have been eligible to participate in the X Handle Marketplace Program due to its severe violations of the Terms of Service and the fact that its accounts were suspended on October 21, 2025.

[22] This is one month after Snail's accounts were already suspended.

73. As a matter of law, Snail never "manifested assent" to the Handle Marketplace Terms, and that document never became the parties' agreement. *One Beacon Ins. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 269 (5th Cir. 2011).

74. In any event, even the Handle Marketplace Terms document itself, which is not the parties' contract, establishes that no arbitration agreement exists. The arbitration clause in the Handle Marketplace Terms states in bolded, capital letters, "**THIS SECTION APPLIES TO YOU ONLY IF YOU LIVE IN THE UNITED STATES**." Ex. 19 (Appx. 169-187), § 12. Snail admits that it is not located in the United States and "is a Nevis limited liability company." Ex. 25 (Appx. 219-255) ¶ 7. It operates an online crypto casino that is not authorized to do business in the United States. Therefore, even if the "X Handle Marketplace Terms" applied here (which it does not), it also establishes that the parties never agreed to arbitrate this dispute.

**B. Governing Law Requires this Court to Stay the Arbitration.**

75. The U.S. Supreme Court has repeatedly held that, "arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (citation omitted); *see also, e.g.*, *Coinbase, Inc. v. Suski*, 602 U.S. 143, 145 (2024) ("Arbitration is a matter of contract and consent, and we have long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes."); *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019) ("The first principle that underscores all of our arbitration decisions is that arbitration is strictly a matter of consent.") (cleaned up).

76. X Corp. never contracted to arbitrate this dispute or to have an arbitrator decide the question of arbitrability. *See, e.g.*, *Lamps*, 587 U.S. at 185-86 ("[W]e presume that parties have not authorized arbitrators to resolve certain 'gateway' questions, such as whether the parties have

a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy.") (cleaned up).

77. Although it is not the case here, even where "parties have agreed to two contracts—one sending arbitrability disputes to arbitration, and the other either explicitly or implicitly sending arbitrability disputes to the courts—a court must decide which contract governs." *Coinbase*, 602 U.S. at 152; *accord id.* ("a court, not an arbitrator, must decide whether the parties' first agreement was superseded by their second"). Accordingly, even if the "X Handle Marketplace Terms" Snail relies on were a contract between the parties with an applicable arbitration clause (it is not), arbitrability must be determined by a court.

78. Under this binding precedent, the arbitration may not continue—including to resolve the threshold question of arbitrability.

**C. Governing Law Requires this Court to Enforce the Forum-Selection Clause in the Applicable Contracts.**

79. For the reasons stated above, Snail agreed that Texas substantive law applies to this dispute. "In Texas, forum-selection clauses are generally enforceable and should be given full effect. Failing to give effect to contractual forum-selection clauses and forcing a party to litigate in a forum other than the contractually chosen one amounts to clear harassment." *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 436 (Tex. 2017) (cleaned up).

80. Courts have upheld and enforced X's Texas forum-selection clause at least five times in the past year. *See, e.g.*, *Trupia v. X Corp.*, 2026 WL 381823 (N.D. Cal. Feb. 11, 2026); *Taddeo-Waite v. X. Corp.*, 2025 WL 3237422 (D. Conn. Nov. 20, 2025); *Doe v. X Corp.*, 2025 WL 3500543 (N.D. Cal. Nov. 6, 2025); *Eliza Labs, Inc. v. X Corp.*, 2025 WL 3003766 (N.D. Cal. Oct. 27, 2025); *Williams v. X Corp.*, 2025 WL 2801626 (S.D. Ala. Oct. 1, 2025).

81. Snail's argument that the "X Handle Marketplace Terms" document applies is also meritless because the Handle Transfer Agreement is a sales contract, governing "the transfer of the Handle" and does not state anywhere that it may be amended, modified, or superseded. Ex. 12 (Appx. 126-131). In similar circumstances, courts consistently apply the version in effect at the time the at-issue transactions occurred. *See, e.g.*, *In re Online Travel Co.*, 953 F.Supp.2d 713, 718-20 (N.D. Tex. 2013).

**D. X Had Ample Cause to Suspend Snail's Accounts**

82. X was fully within its contractual and legal rights to suspend Snail's accounts, including @duel, @monarch, and @castle.

83. As described in detail above, Snail has repeatedly violated X's Terms of Service and the X Rules, which prohibit, among other conduct:

a. Unauthorized access or modification of someone's X account;

b. Trading, buying, selling, or soliciting access of other X accounts;

c. Engaging in platform manipulation, which covers, among other prohibited conduct, deceptive activity that misleads others, manipulates the platform, or disrupts platform defenses on X;

d. Trying to work around technical limitations imposed by X;

e. Attempting to gain unauthorized access to the X service or related systems or networks;

f. Attempting to breach X's systems and networks or to circumvent X's security measures;

g. Circumventing an X permanent suspension or enforcement action, and engaging in behavior intended to evade any X remediation;

h. Selling, purchasing, trading, or offering the sale, purchase, or trade of X accounts or usernames with third parties;

i. Attempting to evade X's enforcement actions by, for example:

   i. creating new accounts;
   ii. imitating a suspended account to replace it; or
   iii. repurposing an already-existing account.

84. As also stated in X's Rules: "If an account has been suspended for violations of the X Rules, X reserves the right to also suspend any other account we believe the same account holder or entity may be operating in violation of our earlier suspension, regardless of when the other account was created."[23]

85. Furthermore, the Handle Transfer Agreement that Snail accepted and agreed to when purchasing the handles at issue provides that:

> By submitting a payment, you agree to and accept these terms. ... In the event that X reclaims the Handle from you, X may refund your one-time cash payment ... unless X finds you to be in violation of any of these Terms or Rules ... Please understand that you cannot "own" the Handle and this transfer does not grant you any right, title, and interest in and to the Handle other than as noted above. ... Please do not participate if you may not be able to access X's service.
>
> Your right to the Handle will also immediately terminate if you breach the terms of this Agreement. Furthermore, X reserves the right to take any action, including, for example, limiting your account's reach, suspending your account, reclaiming the Handle, and other actions as per X's Rules. ... These Terms constitute the entire agreement between you and X with respect to the Handle transfer only, and do not supersede the Rules, and any other agreements you may have with X."

Ex. 12 (Appx. 126-131) (emphasis original).

86. Thus, the Handle Transfer Agreement made clear that "you cannot 'own' the Handle and this transfer does not grant you any right, title, and interest in and to the Handle," beyond "a limited and non-transferable right to use the Handle." *Id.* It also clearly stated that X reserved "the right to take any action, including, for example, limiting your account's reach,

[23] *See* X Authenticity Policy, https://help.x.com/en/rules-and-policies/authenticity.

suspending your account, [and] reclaiming the Handle" as per X's Terms of Service and X's Rules. *Id.* Snail's substantive claims in the arbitration are meritless.

**E. Snail Improperly Commenced an Unauthorized Arbitration**

87. On April 8, 2026, Snail filed a demand for arbitration with the AAA asserting claims arising out of the suspension of its accounts. Ex. 25 (Appx. 219-255).

88. On May 27, 2026, counsel for X Corp. advised counsel for Snail that X Corp. never agreed to arbitrate the dispute and that the demand for arbitration relied on an inapplicable document, one the parties never entered. Snail has nevertheless persisted in pursuing the arbitration it initiated.

89. On June 5, 2026, X submitted to the AAA its objections to the AAA's jurisdiction. Ex. 20 (Appx. 188-205).

90. On June 24, 2026, the AAA stated that Snail "has met the filing requirements contained in the AAA Rules" and that the arbitrator will have the power to determine the extent of its own jurisdiction. Ex. 21 (Appx. 206-208).

91. On June 26, 2026, X again wrote to the AAA objecting to jurisdiction and reiterating that the parties never contracted to arbitrate this dispute, the parties' contracts mandate that Snail bring its claims in Texas courts, the parties never contracted for an arbitrator to decide the question of arbitrability, and no such authority exists under binding Supreme Court precedent. Ex. 22 (Appx. 209-210). X informed the AAA that, because the AAA lacks jurisdiction over the parties' dispute, X would not participate further in that proceeding. *Id.*

92. Over X's objections, on July 15, 2026, the AAA appointed an arbitrator. Ex. 23 (Appx. 211-213). Following an August 25, 2026 hearing that X did not attend, the arbitrator determined that the applicable contracts allow him to determine the extent of his own jurisdiction

and ordered simultaneous briefing on both jurisdictional and merits issues, specifically, whether Snail is entitled to injunctive relief compelling X to restore Snail's platform access including full control and use of the @duel, @monarch, and @castle handles. Ex. 24 (Appx. 214-218). The order further states that the arbitrator will issue a ruling on these issues no later than October 9, 2026. *Id.* at 3 (Appx. 216).

93. Because this is improper under binding U.S. Supreme Court precedent, *see Coinbase*, 602 U.S. at 152, X seeks urgent relief to stay the arbitration proceedings, declare that the parties' contracts mandate that the dispute be brought in Texas state or federal court, and award X its attorneys' fees and costs incurred in bringing this action.

## V. CAUSES OF ACTION

94. The Terms of Service, Purchaser Terms, and Handle Transfer Agreement in effect when Snail purchased the handles at issue contain mandatory forum-selection provisions designating the state and federal courts in Tarrant County, Texas as the sole location where disputes related to X's platform or the handle transactions may be brought. No contract between the parties contains an arbitration clause.

95. Pursuant to Federal Rule of Civil Procedure 65, X seeks a temporary restraining order and preliminary injunction enjoining the arbitration, AAA Case Number 01-26-0001-6924, pending this Court's determination of the arbitrability of Snail's claims.

### A. Count One: Declaratory Judgment

96. Pursuant to Texas Civil Practice and Remedies Code Section 37.003, X seeks a declaratory judgment that:

a. This Court, rather than an arbitrator, has the authority to determine the arbitrability of Snail's claims; and

b. The parties' contracts mandate that Snail bring its claims in state or federal court in Tarrant County, Texas.

97. Pursuant to Texas Civil Practice & Remedies Code Section 37.009, X seeks an award of its attorneys' fees and costs incurred in bringing this action.

**B. Count Two: Permanent Stay of Arbitration**

98. Pursuant to Texas Civil Practice & Remedies Code Section 171.023, X seeks an order permanently staying the arbitration.

99. The arbitration was commenced on April 8, 2026 and is ongoing, with a ruling on jurisdictional and merits issues expected by October 9, 2026. But there is no agreement between the parties to arbitrate this dispute. Instead, all of the parties' contracts mandate that any disputes be brought exclusively in federal or state court in Tarrant County, Texas. X is therefore entitled to a permanent stay of the arbitration.

**C. Count Three: Breach of Contract**

100. The Terms of Service, Purchaser Terms, and Handle Transfer Agreement are all valid and enforceable contracts. X performed under those contracts, including by making its platform available to Immortal Snail, and has not materially breached them.

101. Despite agreeing to resolve "any" and "all" disputes related to those agreements "exclusively" in Texas federal or state courts, Snail breached all three contracts by initiating an arbitration in violation of the forum-selection clauses. *See* Exs. 8, 10, 12 (Appx. 027-047, 070-090, 126-131). Since May 2026, X has repeatedly advised Snail's counsel that no agreement to arbitrate exists, but Snail has persisted in pursuing the arbitration.

102. X has suffered damages as a result of Snail's breaches, including but not limited to the loss of a contractually agreed-upon forum for resolution of disputes, expenditure of time and

effort by X personnel, and the attorneys' fees and costs incurred in objecting to the arbitration and filing this action.

103. X is therefore entitled to contractual monetary damages against Snail, including attorneys' fees and costs, in an amount exceeding $75,000.

104. In addition, X is entitled to an award of its attorneys' fees and costs under Texas Civil Practice & Remedies Code Section 38.001.

## VII. PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff X Corp. prays the Court enter an order that declares Snail's claims must be brought in state or federal court in Tarrant County, Texas, permanently stays the arbitration, awards X monetary damages including its costs and attorneys' fees, and grants all such other and further relief, both general and special, at law and in equity, to which X may be justly entitled.

DATED: September 28, 2026

Respectfully submitted,

**GIBBS & BRUNS, LLP**

By: *_/s/ Caitlin Halpern_*
Caitlin Halpern *(pro hac vice forthcoming)*
Texas Bar No. 24116474
chalpern@gibbsbruns.com
Lauryn E. Bennett *(pro hac vice forthcoming)*
Texas Bar No. 24142674
lbennett@gibbsbruns.com

1100 Louisiana Street, Suite 5300
Houston, Texas 77002
Telephone: 713-650-8805
Facsimile: 713-750-0903

**BROWN PRUITT WAMBSGANSS DEAN FORMAN & MOORE, P.C.**

Charles W. Fillmore
Texas Bar No. 00785861
cfillmore@brownpruitt.com

201 Main Street, Suite 700
Fort Worth, Texas 76102
Telephone: (817) 338-4888
Fax: (817) 338-0700

**ATTORNEYS FOR PLAINTIFF X CORP.**