# EXHIBIT 25

**ARBITRATION BEFORE
AMERICAN ARBITRATION ASSOCIATION**

| | |
|---|---|
| **IMMORTAL SNAIL, LLC**,<br>a Nevis company,<br><br>Claimant,<br><br>v.<br><br>**X CORP**., a Nevada corporation,<br><br>Respondent. | **Case No.**: To be assigned<br>**Arbitrator**: To be assigned |

**DEMAND FOR ARBITRATION AND STATEMENT OF CLAIM**

Under the American Arbitration Association rules and procedures selected by X Corp., a Nevada corporation headquartered in Bastrop, Texas ("X") and referenced and set forth in the terms and conditions established by X governing the handle transfer agreements between X and Immortal Snail, LLC ("Immortal Snail" or "Claimant"), the user of the @Duel, @Monarch, and @Castle handles, Claimant files this Claim against Respondent X. The following Claim describes Claimant's entitlement to the relief sought, including the factual, legal, and procedural bases entitling Claimant to that relief. But first, in brief, here is what the Claim is about and what brings Claimant to the forum.

Immortal Snail entered into three Handle Transfer Agreements (collectively, the "HTAs" or the "Agreements") with X for the handles @Duel, @Monarch, and @Castle (collectively, the "Purchased Handles"). The Agreements are attached as Composite Exhibit 1. Pursuant to the Agreements, in March, April, and June of 2025, X was paid a total of $480,000 for the purchase of rights to those Purchased Handles and the associated accounts.

Shortly thereafter, the Purchased Handles were suspended in what appears to the Claimant to be a blanket and simultaneous ban of the Purchased Handles and related accounts ("Affected

Accounts"). The suspension came by surprise and occurred without meaningful notice or explanation. For the @Monarch account, X provided a cursory notice that the account was suspended "for violating the X Rules. Specifically, for: Violating our rules against ban evasion." For the @Duel account, Claimant received no communication on the ban whatsoever. Instead, the @Duel account suddenly disappeared without explanation. Following the suspension, and in response to the communication, several attempts were made on behalf of the Claimant and other users of the Affected Accounts to communicate with X and appeal the suspension through X's internal channels. Claimant, through those communications, sought to understand the basis for the suspension and to request that it be lifted. X, however, did not provide any substantive information in response, and the suspension continues without explanation.

Claimant relied on X's representations in using the platform and entering the Agreements, paid hundreds of thousands of dollars for the Purchased Handles' rights and licenses, and remains committed to the use of the above referenced handles and Affected Accounts for lawful expression, discussion, and engagement in accordance with X's Rules. Nevertheless, X has taken Claimant's money and banned the Affected Accounts from the platform without deigning to respond to Claimant's letter seeking to resolve this injustice. The January 12, 2026 letter from the undersigned counsel for Claimant to X is attached as Exhibit 2. This tribunal offers Claimant one of its best chances at righting the wrongs worked by X's ban, obtaining equitable relief, and recovering the damages caused by X's mistreatment and broken promises.

**JURISDICTION AND CERTIFICATION OF NOTICE**

1. This Arbitration is commenced pursuant to the X Handle Marketplace Terms (the "X Terms"). A copy of the Terms is attached as Exhibit 3.

2. The X Terms are incorporated and apply to each of the Agreements: "Your purchase is governed by the Terms & Conditions of the Handle Transfer Agreement found at: https://legal.x.com/en/xhandle-transfer-agreement.html". *See* Composite Exhibit 1.

3. As provided in the X Terms, Claimant contacted X at the designated notice mailing address and email address seeking informal resolution on January 12, 2026, but X failed to respond at all. *See* Exh. 3 §§ 12.b., 14.c.; Exh. 2.

4. Section 12.c. provides for resolution before a single arbitrator in this tribunal under the Consumer Arbitration Rules. *See* Exh. 3 § 12.c.

5. The ban of the accounts took place within the year preceding the filing of this Claim. *See* Exh. 3 § 12.c.

6. Claimant hereby certifies that by submitting the January 12 letter and this Claim via the designated notice mailing address and email address, Claimant has provided notice in writing of the basis for the award of the relief that they request herein.

**THE PARTIES**

7. Immortal Snail, LLC is a Nevis limited liability company doing business as an operator of an online gaming and wagering activities platform.

8. X Corp. is a Nevada corporation headquartered in Bastrop, Texas.

**RELEVANT FACTS**

9. On or about March 24, 2025, X invoiced Immortal Snail and was paid $300,000 for the @Duel handle. *See* Composite Exhibit 1.



COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

10. On or about April 16, 2025, X invoiced Immortal Snail and was paid $80,000 for the @Monarch handle. *See* Composite Exhibit 1.

11. On or about June 3, 2025, X invoiced Immortal Snail and was paid $100,000 for the @Castle handle. *See* Composite Exhibit 1.

12. Duel is a cryptocurrency-based online casino and sportsbook operated by Immortal Snail LLC.

13. Claimant launched Duel as a service around June and July of 2025.

14. Duel's main method of marketing is through its presence on the X platform.

15. In or about October 2025, X banned Claimant's accounts and the Affected Accounts that are related to Claimant.

16. X's exclusion of Duel and the Affected Accounts from the platform halted Duel's initial growth and caused Duel's business to stagnate.

17. Claimant and the users of the Affected Accounts have clearly communicated to X that they are committed to careful compliance with X Terms.

18. The only communication from X was a cursory post stating that the @Monarch Account was suspended for violating the X Rules. X referred to their rules against ban evasion but provided no explanation of what had been done to violate a ban or even what ban had allegedly been evaded. X provided no notice or explanation at all for the other Affected Accounts.

19. Following the suspension, and in response to the communication, several attempts were made on behalf of the Claimant to communicate with X and appeal the suspension through X's internal channels.

20. Claimant, through those communications, sought to understand the basis for the suspension and to request that it be lifted.



COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

21. X ignored Claimant or provided vague generalized explanations without substantiating any facts to support their interpretation of the X Terms or their conclusory determination regarding ban evasion.

22. The general, vague, and unsubstantiated justification of ban evasion is a pretext for suspension arising out of improper reasons.

23. Claimant has been subjected to unfair attacks on the platform while being deprived of access to the platform to respond or defend itself with the truth.

24. Claimant has been falsely attacked with vile, scandalous, and baseless allegations that damage it professionally while also damaging its business ventures.

25. Claimant has been subjected to unfair attacks on its business ventures on the platform while being deprived of access to the platform to respond or defend itself with the truth.

26. Since Claimant's main method of marketing Duel was the X platform, the suspension has had a significant detrimental impact on the Claimant's ability to communicate, advertise, engage with its community, and access information during critical phases of product growth.

27. Losing the ability to fully utilize its Purchased Handles on the X platform at these critical phases has and will continue to irreparably harm Claimant in ways that are neither capable of precise quantification nor able to be remedied by money alone.

28. In particular, Duel's launch phase has been severely hindered by the inability to advertise on X, resulting in significant, but extremely difficult to accurately quantify financial setbacks and lost opportunities to reach its target demographic, as well as other ongoing and irreparable harm.



COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

29. Claimant launched an innovative, market redefining business in June and July only to be irreparably harmed by X's October suspension of its Purchased Handles and having its exclusivity, market position, and brand equity diminished or potentially destroyed by that suspension.

30. The loss of market share, flattening of projected growth prospects, stagnation of business, and loss of access to prospective customers arising out of X's October Suspension have irreparably harmed Claimant and will continue to harm it in the future unless and until the tribunal intervenes to do justice on Claimant's behalf.

31. The effect of this hindrance is to give an unfair competitive advantage to business competitors of Claimant.

32. In particular, Claimant has lost market share and access to prospective customers at a critical phase of consumer adoption in a dynamic sector such that Claimant's past, present, and future losses arising from X's suspension of the Purchased Handles may not be precisely quantifiable or capable of remediation through money damages.

33. More broadly, the effect of the suspension generally is to harm Claimant.

34. On information and belief, the Claimant believes that the suspension may have been prompted by accusations or targeted action by others who compete with Claimant in business or desire to cause Claimant harm.

35. On information and belief, Claimant believes that X received information or accusations concerning Claimant before or contemporaneous with the suspension.

36. On information and belief, Claimant believes that X received information or accusations concerning Claimant or was influenced in its treatment of Claimant by a shareholder



COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

of X who also has ties with individuals or entities who compete with Claimant in business or desire to cause Claimant harm.

37. On information and belief, Claimant believes that X has taken decisions negatively affecting Claimant that are driven by, inspired by, or arise out of—at least in part—improper reasons.

38. The suspension has directly and indirectly caused and will continue to cause financial, reputational, and competitive harm to the Claimant.

39. All conditions precedent to the bringing of this action have been satisfied, excused, performed, waived, or would be futile.

40. Claimant has retained undersigned counsel and is obligated to pay their reasonable fees.

**CLAIM I:**
**INJUNCTIVE RELIEF**

41. Claimant incorporates the allegations set forth in paragraphs 1 through 40 as though fully set out here.

42. In March, April, and June 2025, X was paid nearly $500,000 in exchange for the services offered and promises made to Claimant by X.

43. Those funds were paid to X specifically for Claimant to enjoy the unique rights and benefits available to it on the X platform.

44. X unjustly suspended Claimant mere months after extracting nearly half a million dollars for the Purchased Handles.

45. No amount of money can fully replace the unique commercial and personal experience and opportunity provided by platform access and full functionality of the Purchased Handles on X.



COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

46. Accordingly, as a matter of equity, justice, and fairness, Claimant is entitled to injunctive relief of full restoration of platform access including full control, use, and functionality for @Duel, @Monarch, and @Castle.

**CLAIM II:**
**BREACH OF CONTRACT – SPECIFIC PERFORMANCE**

47. Claimant incorporates the allegations set forth in paragraphs 1 through 40 as though fully set out here.

48. In March, April, and June 2025, X was paid nearly $500,000 in exchange for the services offered and promises made to Claimant by X.

49. Claimant performed its obligations under the X Terms and the HTAs.

50. X breached their obligations by wrongly suspending Claimant without basis mere months after extracting nearly half a million dollars for the Purchased Handles.

51. No amount of money can replace the unique commercial and personal experience and opportunity provided by platform access and full functionality of the Purchased Handles on X.

52. Accordingly, Claimant is entitled to specific performance of X's obligations under the X Terms and the HTAs and specifically the full restoration of platform access including full control, use, and functionality for @Duel, @Monarch, and @Castle.

**CLAIM III:**
**BREACH OF CONTRACT – MONEY DAMAGES**

53. Claimant incorporates the allegations set forth in paragraphs 1 through 40 though fully set out here.

54. In March, April, and June 2025, X was paid nearly $500,000 in exchange for the services offered and promises made to Claimant by X.



COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

55. Claimant performed its obligations under the X Terms and the HTAs.

56. X breached their obligations by wrongly suspending Claimant without basis mere months after extracting nearly half a million dollars for the Purchased Handles.

57. X has neither refunded the sums paid for the Purchased Handles nor substantiated any violation of the X Terms.

58. As a direct and proximate cause of Defendant's misconduct, Claimant has suffered damages, including but not limited to compensatory damages, lost profits, disruption to business, damage to reputation, and goodwill, and other consequential damages, as well as interest, costs, and attorneys' fees.

59. Accordingly, Claimant is entitled to an award of damages including but not limited to compensatory damages, lost profits, disruption to business, damage to reputation, and goodwill, and other consequential damages, as well as interest, costs, and attorneys' fees.

**REQUESTED RELIEF**

WHEREFORE, Claimant seeks:

1) a determination that X is required to immediately and fully restore Claimant's platform access including full control, use, and functionality for @Duel, @Monarch, and @Castle;

2) an award of damages including but not limited to compensatory damages, lost profits, disruption to business, damage to reputation, and goodwill, and other consequential damages;

3) an award of interest, costs, and attorneys' fees;

4) as well as any other remedy deemed just and proper by the arbitrator.

Dated: April 8, 2026.

Respectfully submitted,



COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900 F. 305·858·5261

**COFFEY BURLINGTON, P.L.**
*Counsel for Claimaint*
2601 South Bayshore Drive, Penthouse One
Miami, Florida 33133
Telephone: (305) 858-2900
Facsimile: (305) 858-5261

By: */s/ Kevin C. Kaplan*
**Kevin C. Kaplan, Esq.**
Florida Bar No. 933848
kkaplan@coffeyburlington.com
lperez@coffeyburlington.com
**Christopher E. Cheek, Esq.**
Florida Bar No. 91363
ccheek@coffeyburlington.com
lmaltz@coffeyburlington.com
service@coffeyburlington.com

# COMPOSITE EXHIBIT 1

# Invoice

**Invoice number** **27E00D83-0001**
Date of issue March 24, 2025
Date due April 23, 2025
Company Name X Corp.
Address 865 FM 1209 Building 2
City, State, Zip Bastrop, TX 7860
TIN 20-8913779

**Bill to**
Immortal Snail LLC
Arthur L. Evelyn Building, Suite 5, Main Street
Charlestown, Nevis
St. Kitts & Nevis
dr.a@duel.com

**Ship to**
Immortal Snail LLC
Arthur L. Evelyn Building, Suite 5, Main Street
Charlestown, Nevis
St. Kitts & Nevis

## $300,000.00 USD due April 23, 2025

[Pay online]

Your purchase is governed by the Terms & Conditions of the Handle Transfer Agreement found at: https://legal.x.com/en/x-handle-transfer-agreement.html

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| Handle transfer @Duel | 1 | $300,000.00 | $300,000.00 |

| | |
|---|---|
| Subtotal | $300,000.00 |
| Total | $300,000.00 |
| **Amount due** | **$300,000.00 USD** |

**Pay $300,000.00 with a bank transfer**
Bank transfers can take up to two business days. To pay via bank transfer, transfer funds using the following bank information.

| | |
|---|---|
| Bank name | Wells Fargo |
| Routing number | [redacted]0248 |
| Account number | [redacted]4630 |
| SWIFT code | [redacted]SXXX |
| Reference | 27E00D83-0001 |

# Invoice

| | |
|---|---|
| **Invoice number** | **27E00D83-0002** |
| Date of issue | April 16, 2025 |
| Date due | May 16, 2025 |
| Company Name | X Corp. |
| Address | 865 FM 1209 Building 2 |
| City, State, Zip | Bastrop, TX 7860 |
| TIN | 20-8913779 |

**Bill to**
Immortal Snail LLC
Arthur L. Evelyn Building, Suite 5, Main Street
Charlestown, Nevis
St. Kitts & Nevis
dr.a@duel.com

**Ship to**
Immortal Snail LLC
Arthur L. Evelyn Building, Suite 5, Main Street
Charlestown, Nevis
St. Kitts & Nevis

## $80,000.00 USD due May 16, 2025

Pay online

Your purchase is governed by the Terms & Conditions of the Handle Transfer Agreement found at: https://legal.x.com/en/x-handle-transfer-agreement.html

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| Handle Transfer @Monarch | 1 | $80,000.00 | $80,000.00 |

| | |
|---|---|
| Subtotal | $80,000.00 |
| Total | $80,000.00 |
| **Amount due** | **$80,000.00 USD** |

**Pay $80,000.00 with a bank transfer**
Bank transfers can take up to two business days. To pay via bank transfer, transfer funds using the following bank information.

| | |
|---|---|
| Bank name | Wells Fargo |
| Routing number | [redacted]0248 |
| Account number | [redacted]4630 |
| SWIFT code | [redacted]SXXX |
| Reference | 27E00D83-0002 |

# Receipt

| | |
|---|---|
| **Invoice number** | **27E00D83-0003** |
| Receipt number | 2614-2348-6801 |
| Date paid | June 3, 2025 |
| Payment method | Crypto |
| Company Name | X Corp |
| Address | 865 FM 1209 Building 2 |
| City, State, Zip | Bastrop, TX 7860 |
| TIN | 20-8913779 |

**Bill to**
Immortal Snail LLC
Arthur L. Evelyn Building, Suite 5, Main Street
Charlestown, Nevis
St. Kitts & Nevis
dr.a@duel.com

**Ship to**
Immortal Snail LLC
Arthur L. Evelyn Building, Suite 5, Main Street
Charlestown, Nevis
St. Kitts & Nevis

## $100,000.00 paid on June 3, 2025

"Your purchase is governed by the Terms & Conditions of the Handle Transfer Agreement found at: https://legal.x.com/en/x-handle-transfer-agreement.html"

| Description | Qty | Unit price | Amount |
|---|---|---|---|
| Handle Transfer @Castle | 1 | $100,000.00 | $100,000.00 |

| | |
|---|---|
| Subtotal | $100,000.00 |
| Total | $100,000.00 |
| **Amount paid** | **$100,000.00** |

# EXHIBIT 2

COFFEY | BURLINGTON
ATTORNEYS AT LAW

**KEVIN C. KAPLAN**
kkaplan@coffeyburlington.com

2601 South Bayshore Drive, Penthouse
Miami, Florida 33133
T.305·858·2900 F.305·858·5261
www.coffeyburlington.com

January 12, 2026

**VIA EMAIL AND FEDEX - legalnotices@x.com**
X Corp.
Attn: Legal Department - Dispute Resolution
865 FM 1209, Building 2
Bastrop, TX 78602

**Re: @Duel, @Monarch, @Castle, and @CSGOEmpire**

Dear X Legal Team,

We are counsel to Immortal Snail, LLC, the operator of the Duel platform and @Duel X account; Moonrail Limited, B.V., the operator of the CSGOEmpire platform and @CSGOEmpire X account; and Ossi Ketola, the principal and owner of these entities whose personal X account is @Monarch (collectively, the "Affected Parties"). The Affected Parties entered into three Handle Transfer Agreements (collectively, the "Agreements") with X for the handles @Duel, @Monarch, and @Castle (collectively, the "Purchased Handles"), and are also users of other X accounts, including @CSGOEmpire. Pursuant to the Agreements, in March, April, and June of 2025, the Affected Parties paid a total of $480,000 for the purchase of rights to those Purchased Handles and the associated accounts. We write to address the recent suspension of the Purchased Handles and related accounts (collectively, the "Affected Accounts"), which appear to have been targeted in a blanket ban along with various other accounts of users associated with the Affected Parties.

The suspension came by surprise and occurred without meaningful notice or explanation. The only communication from X was a cursory post stating that the accounts were suspended "for violating the X Rules. Specifically, for: Violating our rules against ban evasion." Following the suspension, and in response to the communication, several attempts were made on behalf of the Affected Parties to communicate with X and appeal the suspension through X's internal channels. The Affected Parties, through those communications, sought to understand the basis for the suspension and to request that it be lifted. X, however, did not provide any substantive information in response, and the suspension continues without explanation.

We now write as counsel for the Affected Parties to follow up in the hope that any concerns or issues X may have can be promptly addressed and resolved by the Affected Parties, and the suspension lifted. The Affected Parties relied on X's representations in using the platform and entering the Agreements, paid nearly $500,000 for the Purchased Handles' rights and licenses, and remain committed to the use of the above referenced handles and Affected Accounts for lawful expression, discussion, and engagement in accordance with X's Rules. The

Affected Parties take X's platform policies seriously, have made, and will continue to make every effort to comply.

The suspension has had a significant detrimental impact on the Affected Parties' ability to communicate, advertise, engage with its community, and access information during critical phases of product growth. In particular, Duel's launch phase has been severely hindered by the inability to advertise on X, resulting in significant financial setbacks and lost opportunities to reach its target demographic, as well as ongoing and irreparable harm. The suspension has directly and indirectly caused and will continue to cause financial, reputational, and competitive harm to the Affected Parties, who have simultaneously been the subject of public attack while being deprived of the ability to respond or defend themselves with the truth. Accordingly, the Affected Parties would greatly appreciate a detailed review of the suspension and any clarification regarding the specific rule or content involved, so that the issue(s), if any, can be remedied as soon as possible.

The Affected Parties are also concerned that the suspension may have been prompted by accusations or targeted action by others who compete with the Affected Parties or desire to cause them harm. In the event that X has been the recipient of such accusations or targeted actions concerning the Affected Parties, the Affected Parties respectfully request the opportunity to address any issue(s) of concern for X raised by others.

We remain hopeful that the suspension can be resolved informally with a full restoration of services and access to the platform for each of the above referenced handles and Affected Accounts. In the meantime, we respectfully request that X immediately reinstate the above referenced handles and Affected Accounts pending the outcome of this review.

We are happy to continue to communicate in writing, and we can also be available to talk further by phone and videoconference. Given our involvement as counsel, we ask that all further communications related to these issues be directed to us. Finally, while our goal is to ensure the prompt restoration of services for the above referenced handles and Affected Accounts through this informal communication, please understand that the Affected Parties expressly reserve all of their rights and remedies, which are in no way waived. We look forward to a prompt response by X and its representatives.

Sincerely,

COFFEY BURLINGTON, P.L.

*/s/Kevin C. Kaplan*
*/s/Christopher E. Cheek*

# EXHIBIT 3

# X Handle Marketplace Terms

## Preface

October 13, 2025

We are establishing a new standard for social media handles—a framework we hope the broader industry will adopt, similar to how Community Notes has influenced online transparency. The X Handle Marketplace is an evolving initiative, and as we refine and expand its capabilities, it is critical to preserve the flexibility for responsible innovation while protecting against misuse or manipulation.

The terms that follow are crafted to embody this vision. They serve to uphold the system's integrity and enable us to advance this emerging category in a fair, secure, and sustainable manner.

We recognize that the majority of users engage with good faith and sound judgment, and these rules are not intended to impose undue burdens. Nonetheless, we recommend reviewing them thoroughly to comprehend your rights and obligations when utilizing the Handle Marketplace.

We appreciate your participation in this new phase of digital identity, and we hope you enjoy your new handle.

# Introduction

The X Handle Marketplace Terms (“**Terms**”) are between you and X Corp., on behalf of itself and its Affiliates (collectively, “**X**” or “**we**”) and govern your access to and use of X’s Handle Marketplace and other services that link to these Terms (collectively the “**Program**”). In these Terms, “**Affiliate**” means any entity that directly or indirectly controls, is controlled by, or is under common control with X, and “**you**,” “**your**,” means you, an individual, company or any other entity with an X account participating in the Program. If you are entering into these Terms on behalf of an entity, you represent and warrant you are authorized on such entity’s behalf to enter into these Terms, and that the entity accepts full responsibility for compliance with these Terms.

To participate in the Program, you must meet the eligibility requirements set forth in Section 3.

In addition to these Terms, your participation in this Program is subject to the X (https://x.com/tos)Terms of Service (https://x.com/en/tos), the X Privacy Policy (https://x.com/privacy), the X Rules and Policies (https://help.x.com/rules-and-policies#x-rules), the X Purchaser Terms (https://legal.x.com/en/purchaser-terms.html) and all policies incorporated therein (collectively, the “**User Agreement**”). Please note that the appropriate invoicing entity is set forth in the X Purchaser Terms (https://legal.x.com/en/purchaser-terms.html).

Please read these X Handle Marketplace Terms carefully to make sure you understand the applicable terms, conditions and exceptions.

IF YOU LIVE IN THE UNITED STATES, THESE TERMS INCLUDE IMPORTANT INFORMATION ABOUT RESOLVING DISPUTES THROUGH BINDING ARBITRATION INSTEAD OF IN COURT, INCLUDING A WAIVER OF YOUR RIGHT TO BRING CLAIMS AS CLASS ACTIONS, THE OPTION TO OPT OUT, AND A LIMITATION ON BRINGING CLAIMS AGAINST X MORE THAN ONE YEAR AFTER THE RELEVANT EVENTS, WHICH AFFECTS YOUR RIGHTS AND OBLIGATIONS IF A DISPUTE WITH X ARISES. SEE SECTION 12 FOR DETAILS ON THESE PROVISIONS.

# 1. Acceptance

By participating in the Program or otherwise indicating your acceptance (for example, by agreeing to these Terms when accessing the Program, searching for, or requesting transfer of a Handle, etc.), you represent and warrant that you have read, understand, and agree to be bound by these Terms. By accepting these Terms, you further agree to (i) X's use of the data that you provide, we collect about you, or we infer about you to consider your acceptance or participation in the Program; and (ii) X's use of your public posts about the Handle Marketplace for promotional purposes. If you do not agree, do not participate in the Program.

# 2. X Handle Marketplace

The X Handle Marketplace allows eligible users to search for usernames on the X platform preceded by an "@" symbol ("Handles") that may be available for transfer to associate with an eligible user's account, to submit requests for transfer of a Handle to that eligible user's account, and, if applicable, to pay a transfer price for transfer of a Handle, all in accordance with these Terms.

A "Handle" is how you're identified on X and is displayed with your X account(s). A Handle is public. When a Handle is transferred from X to an eligible user, that eligible user receives a limited, revocable, and non-transferable right to use the Handle subject to these Terms and the User Agreement. X retains ownership of the Handle at all times. You cannot "own" the Handle and this transfer does not grant you any right, title, or interest in and to the Handle other than as noted above. To avoid any doubt, the Handle is not "your Content" as set forth in the X Terms of Service (https://x.com/en/tos). Do not participate if you reasonably expect that you may not be eligible or able to access X's service.

# 3. Eligibility for Marketplace Access, Handle Transfer, and Requirements for Continued Use of Handle

The eligibility requirements for the Program can be found in our Help Center (https://help.x.com/en/using-x/x-handle-marketplace), and may change from time to time, including for any valid business, financial, or legal reasons.

### 3a. Eligibility For Accessing the Marketplace

To access the marketplace, for example, you must have an X Premium account that remains active and in compliance with the User Agreement, and agree to these Terms.

### 3b. Eligibility For Requesting Transfer of a Handle

In addition to agreeing to these Terms, you must meet the following (and any additional criteria set forth in the Help Center (https://help.x.com/en/using-x/x-handle-marketplace)) to request Handle transfer:

- **Personal Accounts:** For personal accounts related to an individual and not operated for the benefit of a business, you must be an X Premium+ subscriber to request Handle transfer.
- **Business or Organizations Accounts:** For business or organizations accounts operated primarily for the benefit of a business or organization, you must be a Premium Business Full Access or Premium Organization Full Access subscriber to request a Handle transfer.

Failure to adhere to any of these requirements and the full list of criteria in the Help Center (https://help.x.com/en/using-x/x-handle-marketplace) will lead to rejection of your Handle transfer request. If your request is approved, there are also requirements for maintaining access to a transferred Handle in Section 3c.

### 3c. Maintaining Your Access To A Transferred Handle

In addition to agreeing to these Terms, you must meet the following (and additional criteria set forth in the Help Center (https://help.x.com/en/using-x/x-handle-marketplace)) requirements to retain your Handle:

- **Handle activity and stewardship:** To maintain a healthy and active handle namespace, X may reclaim handles if they are not being used in a manner that contributes meaningfully to the platform, in X's sole discretion. For more information, please see our Help Center (https://help.x.com/en/using-x/x-handle-marketplace). Failure to do so may result in X reclaiming the transferred Handle, terminating all of your rights to the Handle without notice, compensation, or refund except as may be required by law.
- **Continued compliance:** If your participating account violates our rules and policies, including the User Agreement, we will notify you and pause your participation in the program. You will have an opportunity to appeal by writing to X by responding to the email we will send to you with meaningful evidence that your account should be reinstated. If the evidence is insufficient, or you fail to respond, we will cancel your participation, reclaim any Handle transferred to your account, and block future eligibility. No refund will be issued except as may be required by law.
- **Maintain Active Subscription for Premium+ Accounts:** If your participating account violates our rules and policies, including the User Agreement, we will notify you and pause your participation in the program. You will have an opportunity to appeal by writing to X by responding to the email we will send to you with meaningful evidence that your account should be reinstated. If the evidence is insufficient, or you fail to respond, we will cancel your participation, reclaim any Handle transferred to your account, and block future eligibility. No refund will be issued except as may be required by law.
- **Maintain Active Subscription for Premium Business Full Access or Organization Full Access Accounts:** If your transferred handle is designated for business or other non-personal use, and you did not pay a Transfer Price, you must maintain an active Premium Business Full Access or Premium Organizations Full Access subscription to retain use of any transferred Handle. For Premium Business Full Access or Premium Organizations Full Access, if you fail to maintain an active subscription, X may reclaim the Handle and terminate all of your rights to the Handle 30 days after your last active subscription day without notice, compensation, or refund except as may be required by law. Appeals are not available once a handle has been reclaimed due to lack of a Premium Business Full Access or Premium Organizations Full Access subscription.

Failure to adhere to any of these requirements and the full criteria set forth in the Help Center (https://help.x.com/en/using-x/x-handle-marketplace) will lead to reclaiming of any transferred Handle as described in Section 6.

# 4. Rules and Restrictions

You may not engage in arbitrage, develop a competing product, or otherwise exploit the X Handle Marketplace, as determined by X in its sole discretion (for example, no automated scripting or use of bots to search or request Handles, or transferring handles to resell or give those accounts to other parties).

You understand that your participation in the Program is not an endorsement of you by X, nor does your participation create any partnership, association, joint venture, agency relationship, or material connection between you and X, and you may not suggest otherwise. You may only transfer a handle via the Handle Marketplace in good faith for your or your business' or organization's use on X. Transferred handles are for your use only.

You may not participate in the Program if you are a person with whom U.S. persons are not permitted to have dealings pursuant to economic sanctions, including, without limitation, sanctions administered by the United States Department of the Treasury's Office of Foreign Assets Control or any other applicable sanctions authority ("**Prohibited Person**"). This includes, without limitation, persons located in, or a citizen of, or ordinarily resident in, the following countries and regions: Cuba, Iran, the Crimea Region of Ukraine, North Korea and Syria. You represent and warrant that you are not a Prohibited Person. You may not participate in the Program if you work for a government institution, are an elected official, are a political party, or engaged in any election-related activity.

Violation of any of the above rules and restrictions may lead to termination of your participation in the Program, and X reclaiming any Handle transferred to you, without any notice, refund, or other compensation as described in Section 6.

# 5. Requesting a Handle Transfer, Transferring a Handle, and Transfer Payment

Eligible users who request a Handle transfer may be required to pay X an associated one-time Transfer Price (determined solely by X) along with any applicable taxes via X's payment platform, subject to X's Purchaser Terms (https://legal.x.com/en/purchaser-terms.html), in order to transfer the Handle. All transactions are final and non-refundable except as required by law. X may also initiate Handle transfers in its sole discretion, including, for example if accounts are stolen.

Upon approval of a Handle transfer request by X (and upon completion of payment of a Transfer Price, if applicable), X will transfer the requested Handle to you for your use on X in association with your account, subject to these Terms and the User Agreement.

As the recipient of the transfer, X grants you a limited, revocable, non-transferable license to use the Handle, but you do not own the Handle or gain any title or interest beyond this license. The Handle is not "your Content" under the User Agreement, and all use of the Handle, including any goodwill generated by such use, shall inure to the benefit of X and shall not create, confer, or give rise to any such rights, claims or expectations upon you..

You may either receive transfer of your newly granted Handle to your current account (exchanging it with your current handle) or create a new account where the Handle may be transferred post-registration. Please note that you may not be able to immediately receive transfer of the Handle, including, for example, while waiting for any financial transaction to complete or to meet any other obligations it may have to its payment processor or any other entity or agency, or confirming your eligibility under Section 3. You agree to work with X subject to our procedures, at our sole discretion, to complete a Handle transfer or create new accounts with the Handle. You may not transfer the Handle to a third party. Any attempt to do so will immediately terminate your right to use the Handle and may result in permanent suspension of your account per the X Rules (https://help.x.com/en/rules-and-policies#general).

# 6. Termination from Program and Handle Reclamation

These Terms will commence on the date you click to access the X Handle Marketplace and will continue until terminated by either party as provided in this Agreement. X may terminate these Terms, at any time, with or without cause, in X's sole discretion, including, without limitation, if you misrepresent yourself or your account; violate these Terms, the User Agreement, or any applicable laws; or no longer meet the eligibility requirements to participate in the Program.

X may reclaim the Handle at any time, for any (or no) reason. Upon reclamation, X may, in its sole discretion for business, legal, or other reasons, refund up to the full Transfer Price paid by you, if any, but if reclamation is due to your breach of these Terms or the User Agreement, there will be no refund or other compensation. Your right to use the Handle terminates immediately upon such breach. If you change

your Handle from the Handle you requested and received through the X Handle Marketplace, your license to that Handle is terminated and X will reclaim that Handle and you will not be owed any refund or other compensation.

In addition, we reserve the right, in our sole discretion, to: suspend, remove or disable access to your account, limit your account reach, reclaim any Handle, cease providing you with all or part of the Program; remove you from the Program if we believe you or your account is in breach or violation of these Terms, the User Agreement or any applicable laws. We will have no liability for taking any of the above actions.

Upon your termination, X will terminate your access to any transferred Handle(s), reclaim the Handle(s), and terminate all associated rights without refund or compensation, except as required by law. X may, in its sole discretion and at any time, assign any transferred Handle(s) to other users for their use. In any event, and only to the extent that is required by law, your sole and exclusive remedy for any termination, reclamation, further transfer, or other action related to the Handle shall be limited to a refund of the Transfer Price (if applicable, and in X's discretion as set forth above), and you hereby waive, release, and exempt X from any other claims, damages, liabilities, or remedies, whether current or future, arising from or related to such actions.

In addition, X may terminate your participation in the Program or reclaim your handle if:

a. X believes, in its sole discretion, that you have violated the Terms or your use of the Handle Marketplace would violate any applicable laws;

b. X is requested or directed to do so by any competent court of law, regulatory authority, or law enforcement agency;

c. X has unexpected technical or security issues;

d. X believes, in its sole discretion, you have violated the X User Agreement;

e. X believes, in its sole discretion, you are engaging in manipulation or other disruptive or prohibited conduct generally or in connection with the Handle Marketplace;

f. You create risk or possible legal exposure for X;

g. Your account should be removed due to unlawful conduct;

h. Your account should be removed due to prolonged inactivity;

i. Our provision of the Handle Marketplace (in whole or in part) to you is no longer commercially viable (in X's sole discretion); or

j. You further transfer, sell, or otherwise allow others to use the Handle.

# 7. Confidentiality

During and after your participation in the Program, you shall not disclose any proprietary and/or non-public information of X provided to you or to which you have access in connection with the Program ("Confidential Information"), including but not limited to pricing information and availability of handles, except as authorized in writing by X or as required by law or court order, provided: (a) you will promptly notify X in writing of the requirement for disclosure, and (b) disclose only that portion of the Confidential Information legally required. This excludes information that is publicly available. You shall promptly notify X of any actual or suspected misuse or unauthorized disclosure of Confidential Information. Upon termination of these Terms and/or your participation in the Program, you will promptly destroy or erase any Confidential Information in your possession or control.

# 8. Disclaimer

You acknowledge that the program (or its features) may be experimental or in a beta phase, and you agree that accessing or using the program and any transferred handles is at your own risk. To the fullest extent allowed by law, the program and any handles are provided "as is" and "as available," with all faults and without any warranties. X disclaims all warranties, whether express or implied, including, but not limited to, warranties of title, non-infringement, merchantability, fitness for a particular purpose, or those arising from course of dealing or performance. X makes no warranties or representations and disclaims all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, exclusivity, security, or reliability of the program and handles, and (ii) whether the program or handles will meet your requirements or be available on an uninterrupted, secure, or error-free basis. X makes no guarantees about handle availability, the success of a handle transfer, future platform changes, or changes to the program and/or its availability.

# 9. Limitation of Liability

To the fullest extent permitted by applicable law, X, its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors (collectively, the “X Entities”) shall not be liable for any indirect, incidental, special, consequential, or punitive damages, or any loss of profits, revenues, data, use, goodwill, or other intangible losses, resulting from (i) your access to, use of, or participation in (or inability to access, use, or participate in) the program or its features; (ii) any conduct or content of third parties on the X Services, including defamatory, offensive, or illegal conduct of other users or third parties; (iii) any content obtained from the X Services; or (iv) unauthorized access, use, or alteration of your Handle transmissions or content. The X Entities’ total liability shall not exceed the greater of one hundred U.S. dollars (US$100.00) or the Transfer Price you paid to X, if any, (if applicable, and in X's discretion as set forth above) under these terms before the event giving rise to the claim. These limitations apply to any liability theory, whether based on warranty, contract, statute, tort (including negligence), or otherwise, even if the X Entities were informed of the possibility of such damage or if a remedy fails its essential purpose.

Applicable law in your jurisdiction may not allow certain liability limitations. To the extent required by law, the above does not limit the X Entities’ liability for fraud, fraudulent misrepresentation, death, or personal injury caused by negligence, gross negligence, or intentional conduct. To the fullest extent allowed under applicable law, the X Entities’ maximum aggregate liability for any non-excludable warranties is limited to one hundred U.S. dollars (US$100.00).

# 10. Representations and Warranties

You represent and warrant that: (a) you have, or have obtained, and will maintain all rights, authorizations and licenses that are necessary to perform your obligations under these Terms, (b) all of the information provided by you to X to enroll and participate in the Program and transfer or request to transfer any Handle and make any associated transfer payment is correct, accurate, complete and current at all times, (c) you are at least eighteen (18) years of age, (d) you have all necessary rights, power, and authority to enter into these Terms, (e) you comply, and will continue to comply, with all applicable laws, rules, statutes, ordinances, regulations and ethical obligations in your performance of any acts hereunder (including, without limitation, any relevant data protection and privacy laws), and you will not cause X to be in violation of any of the foregoing, (f) you will at all times adhere to the User Agreement, and (g) your account will not violate or infringe the rights of any third

party (including copyright, trademark, service mark, trade secret, contract, privacy or right of publicity rights) or contain any material that, if relied upon, might cause harm or injury to any person or property.

# 11. Indemnity

You agree to indemnify, defend and hold the X Entities (collectively, "**Indemnified Persons**") harmless from and against any and all third party claims, liability, loss, and expense (including damage awards, settlement amounts, and reasonable legal fees), brought against any Indemnified Person(s), arising out of or related to: (a) your participation in the Program including your use of the Handle, (b) breach of your representations, warranties and obligations as set forth in these Terms, or (c) your negligence or misconduct. Your indemnification obligations hereunder will be subject to: (i) the Indemnified Persons providing prompt written notice of the claim to you, provided that any delay in notification will not relieve you of your indemnification obligations except and solely to the extent that such delay materially impairs your ability to defend such claim, (ii) the Indemnified Persons reasonably cooperating with you with respect to the defense and settlement of such claim, and (iii) you permitting X, at its option, to participate in and control the defense and settlement of such claim. You will not settle any such claim that may compromise any interest of the Indemnified Persons without the Indemnified Persons' prior written consent; provided that the Indemnified Persons will reasonably cooperate with such defense or settlement, at your request and expense.

# 12. Dispute Resolution Agreement--Binding Arbitration and Class Action Waiver

**THIS SECTION APPLIES TO YOU ONLY IF YOU LIVE IN THE UNITED STATES. PLEASE READ THIS SECTION CAREFULLY – IT MAY SIGNIFICANTLY AFFECT YOUR LEGAL RIGHTS, INCLUDING YOUR RIGHT TO FILE A LAWSUIT IN COURT.**

**a. <u>General.</u>** The following provisions are important with respect to the agreement between you and X regarding X's features and services memorialized by these Terms. Subject to the provisions below, including exceptions set forth in this Section, you and X agree to arbitrate any disputes, claims, or controversies arising out of or relating to these Terms and/or your participation in the Program (individually a "**Dispute**," or more than one, "**Disputes**").

**b. <u>Initial Dispute Resolution.</u>** Most disputes between you and X can be resolved informally. You may contact us by writing to Paid Support here (https://help.x.com/using-x/x-premium-faq). When you contact us, please provide a brief description of the nature and bases for your concerns, your contact information, and the specific relief you seek. The parties shall use their best efforts through this support process to settle any Dispute other than an Exempted Dispute. You and we agree that good faith participation in this informal process is required and must be completed as set forth above before either party can initiate arbitration regarding any Dispute.

**c. <u>BINDING ARBITRATION.</u> If we cannot reach an agreed upon resolution with you regarding a Dispute within a period of thirty (30) days from the time informal dispute resolution commences under the Initial Dispute Resolution provision above, then either you or we may initiate binding arbitration, which will be the sole means to resolve any Dispute, subject to the terms set forth below and except for claims brought in small claims court or Exempted Disputes, unless you opt out. Specifically, all Disputes shall be finally resolved exclusively through binding arbitration administered by the American Arbitration Association ("AAA") in New York, NY, and through a single mutually agreed upon arbitrator, in accordance with the provisions of the AAA's Consumer Arbitration Rules, available at www.adr.org (http://www.adr.org/) or by calling the AAA at 1.800.778.7879, except as provided below. YOU AND X HEREBY EXPRESSLY WAIVE THE RIGHT TO A TRIAL BY JURY OR JUDGE, EXCEPT WITH RESPECT TO EXEMPTED DISPUTES.**

**Except with respect to Exempted Disputes, the arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any Dispute, including, but not limited to, any claim that all or any part of these Terms are void or voidable, or whether a Dispute is subject to arbitration. The arbitrator shall be empowered to grant whatever relief would be available in a court under law or in equity, provided that such relief (including injunctive relief) is limited to your individual circumstances. Notwithstanding the requirements of this arbitration provision, if the Dispute involves a claim for public injunctive relief, you may choose to sever that claim from the arbitration proceeding and bring it in any court of proper jurisdiction. The arbitrator's award shall be written and binding on the parties and may be entered as a judgment in any court of competent jurisdiction.**

**YOU HAVE ONE YEAR TO BRING A CLAIM AGAINST X.** You must bring any claim against X arising out of or related to these Terms within one (1) year after the date of the occurrence of the event or facts giving rise to the dispute, unless applicable law

provides that the normal statute of limitations for that claim may not be shortened by agreement. If you do not bring a claim within this period, you forever waive the right to pursue any claim or cause of action, of any kind or character, based on such events or facts, and such claims or causes of action are permanently banned, and X will have no liability with respect to such claim.

**d. Filing Process and Costs.** To start an arbitration, you can get submission instructions at: https://adr.org/Support (https://adr.org/Support). X will pay the consumer's initial filing fee of $200, however notwithstanding any rules of the AAA to the contrary, the parties agree to share equally all other costs of the arbitration, including the arbitrator's fees and expenses, except to the extent required by law. The arbitrator (and not AAA) shall have the sole authority to determine any disputes that arise concerning the allocation of costs and expenses, including the fees and expenses of the arbitrator. If the arbitrator determines that claims were filed for the purposes of harassment or were patently frivolous, the arbitrator can reallocate the arbitrator's compensation and administrative fees, including the filing and hearing fees, as set forth in the AAA Consumer Arbitration Rules. The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court.

**e. Location.** Arbitration will take place on a documents-only basis or you can choose to conduct the proceedings by telephone, video, or in-person. For in-person arbitration, the proceedings will be in the city or county where you reside or, if you do not reside in the United States, in the State of New York, County of New York.

**f. Class Action Waiver.** To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

**g. Severability.** If it is determined that any part of this Dispute Resolution Agreement cannot be enforced as to a particular claim for relief or remedy (such as injunctive relief), then that claim or remedy (and only that claim or remedy) shall be severed and must be brought in a court of proper jurisdiction and any other claims must be arbitrated.

**h. Exception - Exempted Disputes and Small Claims Court Claims - Forum Selection.** Notwithstanding the parties' decision to resolve all other Disputes through arbitration, any disputes, claims, or controversies arising from fraud ("**Exempted**

**Disputes**") shall be submitted to the exclusive jurisdiction of the federal or state courts located in New York County, New York, United States, and you consent to personal jurisdiction in those courts and waive any objection as to inconvenient forum. Without prejudice to, and notwithstanding the foregoing, you agree that, in its sole discretion, X may bring any Exempted Dispute we have against you in any competent court in the United States. Either party may also seek relief in a small claims court for disputes or claims within the scope of that court's jurisdiction.

**i. <u>30-Day Right to Opt Out.</u>** If you wish to opt out and not be bound by these arbitration provisions set forth above, you can send written notice of your decision to opt out to the following address:

X Corp.
Attn: Legal Department - Arbitration Opt Out
865 FM 1209, Building 2
Bastrop, TX 78602

If you have already been accepted to the Program, you may submit your opt out notice by writing to Paid Support here (https://help.x.com/using-x/x-premium-faq).

Your written notification must include your name, X account handle, the email address or phone number associated with your account handle, and a clear statement that you do not wish to resolve Disputes with X.

The notice must be sent within 30 days of your acceptance of these Terms, otherwise you shall be bound to arbitrate disputes in accordance with the terms of those provisions. You may also send the notice prior to accepting these Terms, in which case we will deem you to have opted out of arbitration. Your decision to opt out of this arbitration provision will have no adverse effect on your relationship with X or the delivery of features or services to you by X. If you opt out of those provisions, X also will not be bound by them.

**j. <u>Changes to this Section.</u>** We will provide 30-days' notice of any material change to this Dispute Resolution Agreement. Changes will become effective on the 30th day, and will apply prospectively only to any claims arising after the 30th day.

**k. <u>Choice of Law.</u>** THESE TERMS MEMORIALIZE A TRANSACTION IN INTERSTATE COMMERCE. THE FEDERAL ARBITRATION ACT AND INTERPRETING CASE LAW GOVERN THE INTERPRETATION AND

ENFORCEMENT OF THESE ARBITRATION PROVISIONS, WITHOUT REGARD TO STATE LAW. To the extent state substantive law applies to any Dispute, the law of the State of Texas shall apply, without regard to conflict of law provisions.

**l. <u>Survival.</u>** This Dispute Resolution Agreement survives the end of the relationship between you and X, including cancellation of or unsubscribing from any services or communications provided by X.

# 13. Modification of Terms

We reserve the right to modify these Terms, from time to time. We will notify you of material revisions, for example via a service notification or an email to the email associated with your account. Your continued participation in the Program after changes have become effective will be deemed as your acceptance of such changes. If any changes are not acceptable to you, you may terminate your participation in the Program by providing written notice to X by writing to Support using the Support function on the Handle Marketplace platform at handles.x.com.

The X Handle Marketplace Terms are written in English but are made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X Handle Marketplace Terms shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X Handle Marketplace Terms.

# 14. Miscellaneous

**a. <u>Feedback.</u>** You may provide X with comments concerning the Program and use of features and services provided by X ("**Feedback**"). You agree that X and its designees will be free to copy, modify, create derivative works, publicly display, disclose, distribute, license and sublicense, incorporate, and otherwise use the Feedback, including derivative works thereto, for any and all commercial and non-commercial purposes, including for promotional and marketing purposes, for example, in posts, and to edit the Feedback in a manner that does not alter its meaning, as well as to mention and/or link out to your name, social media profile(s), image, and/or your posts without any further remuneration, compensation, or credit to you. You also understand that X has no obligation to use any of the Feedback you provide, or to run any intended use of the Feedback by you. Nothing in this Agreement will prevent X from developing features, products or services that may be competitive with you or any end users' features, products or services.

**b. <u>Governing Law.</u>**

- If you live in the United States, these Terms will be governed by the laws of the State of Texas and any Dispute that arises between you and X will be subject to Section 1 (https://legal.x.com/creator-revenue-sharing-terms.html#SF-Chapter13)2 above (Dispute Resolution Agreement--Binding Arbitration and Class Action Waiver).

- If you live in an EU Member State, an EFTA State, or the UK, to the extent permitted by law, all disputes related to these Terms, including any disputes, claims, or controversies arising out of or relating to these Terms will be brought exclusively before a competent court in Ireland without regard to conflict of law provisions and will be governed by Irish law, notwithstanding any agreement between you and us to the contrary. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim.

- If you live outside of the United States, an EU Member State, an EFTA State, or the UK, these Terms will be governed by the laws of the State of Texas.

**c. <u>Notices.</u>** Any notices to X must be sent to: X Corp., 865 FM 1209, Building 2, Bastrop, TX 78602, USA, Attn: Legal Department, via first class or air mail or overnight courier, with a copy via email to legalnotices@x.com and are deemed given upon receipt. Notice to you may be provided by sending email to the email address associated with your X account, or by posting a message to your X account or the X Service, and is deemed received when sent (for email) or posted.

**d. <u>Waiver.</u>** The failure of X to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision. X's waiver of any default is not a waiver of any subsequent default.

**e. <u>Survival; Severability.</u>** Any obligations, which expressly or by their nature continue after termination of these Terms, shall survive and remain in effect after such happening. Unenforceable provisions will be modified to reflect the parties' intention, and remaining provisions of these Terms will remain in full effect.

**f. <u>Assignment.</u>** You may not assign or transfer these Terms, or any of your rights or obligations hereunder, and any such attempt will be null and void.

**g. Force Majeure.** Neither party will be liable for any delay or failure of or in performance of its obligations under these Terms due to causes beyond its reasonable control, including, but not limited to, acts of God, acts of the public enemy, government acts, fire, floods, epidemics (including COVID-19), quarantine restrictions, strikes, civil commotions, act(s) or threatened act(s) of terrorism, failure or delay of telecommunications or technical equipment or infrastructure, or freight embargoes ("**Force Majeure Event**"), and each party shall be excused from performance of its obligations hereunder for the duration of such Force Majeure Event.

**h. Entire Agreement.** These Terms (including the User Agreement and X Purchaser's Agreement referenced herein) constitute the entire understanding between X and you with respect to the subject matter of these Terms and merges and supersedes all prior communications, understanding, and agreements between the parties concerning the subject matter, whether written or oral.

## X platform

- X.com (https://x.com/)
- Status (https://docs.x.com/status)
- Accessibility (https://help.x.com/resources/accessibility)
- Embed a post (https://publish.x.com)
- Privacy Center (https://privacy.x.com/)
- Transparency Center (https://transparency.x.com/)
- Download the X app (https://help.x.com/using-x/download-the-x-app)
- Try Grok.com (https://grok.com)

## X Corp.

- About the company (https://about.x.com/en)
- Company news (https://blog.x.com/)
- Brand toolkit (https://about.x.com/en/who-we-are/brand-toolkit.html)
- Jobs and internships (https://careers.x.com/)
- Investors (https://investor.twitterinc.com/)

# Help

- Help Center (https://help.x.com/)
- Using X (https://help.x.com/en/using-twitter)
- X for creators (https://create.x.com/)
- Ads Help Center (https://business.x.com/en/help.html)
- Managing your account (https://help.x.com/en/managing-your-account)
- Email Preference Center (https://preferencecenter.x.com/)
- Rules and policies (https://help.x.com/en/rules-and-policies)
- Contact us (https://help.x.com/en/forms)

# Developer resources

- Developer home (https://developer.x.com/en)
- Documentation (https://developer.x.com/en/docs)
- Forums (https://twittercommunity.com/)
- Communities (https://developer.x.com/en/community)
- Developer blog (https://blog.x.com/developer/)
- Engineering blog (https://blog.x.com/engineering/en_us.html)
- Developer terms (https://developer.x.com/en/more/developer-terms)

# Business resources

- Advertise (https://business.x.com/en/advertising.html)
- X for business (https://business.x.com/)
- Resources and guides (https://business.x.com/en/resources.html)
- X for marketers (https://marketing.x.com/)
- Marketing insights (https://marketing.x.com/en/insights)
- Brand inspiration (https://marketing.x.com/en/success-stories)
- X Ads Academy (https://www.xadsacademy.com/sl/5c3e29ed)

© 2025 X Corp.

Cookies (https://help.x.com/rules-and-policies/twitter-cookies)

Privacy (https://x.com/privacy)

Terms and conditions (https://x.com/tos)